UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CESILY D. HARRIS,                                      Case No: 2:11-cv-14030

                              Plaintiff,

v.                                                             Honorable Gerald E. Rosen

RIVER ROUGE HOUSING                          Magistrate Laurie J. Michelson
COMMISSION,

                              Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

Plaintiff Cesily D. Harris commenced this action on September 15, 2011, alleging that her former employer, Defendant River Rouge Housing Commission ("RRHC") violated the Fair Labor Standards Act, the False Claims Act, the Michigan Whistleblower Protection Act, and Michigan Public Policy when it discharged her because she was threatening to expose RRHC's plan to submit false reports to the U.S. Department of Housing and Urban Development which overstated the rate of pay that she and some of her coworkers were receiving.

On May 31, 2012, RRHC filed a motion seeking summary judgment in its favor on all claims. Plaintiff has responded to Defendant's Motion, and Defendant has replied to Plaintiff's response.  Having thoroughly reviewed and considered the parties' briefs and supporting documents and the entire record of this matter, the Court has determined

1

#

that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not assist in the resolution of this motion. Accordingly, the Court will decide Defendant's motion "on the briefs." See L.R. 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II.    PERTINENT FACTS

Plaintiff, Cesily D. Harris began working for the River Rouge Housing Commission as a temporary administrative assistant in October, 2010. [Harris Dep., p 107]. Approximately six months later, she applied for a permanent position with RRHC as its Capital Funds Program ("CFP") Assistant. [Harris Dep. p. 112].  Ms. Harris interviewed for the position with RRHC Executive Director Michael Sloan and Commissioners Dwight Black and Rayfield Rogers. [Harris Dep. p. 114] [Sloan Dep. p. 62] During the interview, Ms. Harris was told that the CFP Assistant position entailed assisting the Coordinator, Willie Burgess, with various tasks related to maintenance and emergency maintenance, and "assisting him with any reports or paperwork that he need[ed] [her] to assist him with," [Harris Dep. p. 115] and that she would be working on the five-year plan.

Approximately two weeks later, Ms. Harris was notified that she had been selected for the CFP Assistant by Director Sloan, subject to approval by the RRHC Board, and that she would be paid $15.00 per hour. [Sloan Dep. p. 64].  Ms. Harris was unanimously approved by the Board on June 2, 2011, and she began working as a CFP Assistant shortly thereafter. [Plaintiff's Ex. H].

\#

According to Ms. Harris, she was not told by Director Sloan or anyone else at this or any other point before receiving her first paycheck as a CFP Assistant that there was a 'probationary' or 'orientation' period for new hires, or that her hourly wage would be less than $15.00 per hour during her first ninety days or six months in the position. [Harris Dep. pp. 125-26] The RRHC Personnel Policies and Procedures Handbook informs new hires that there is a 90-day 'orientation period' for new hires, during which new hires are evaluated, and after which they will become eligible for fringe benefits, but makes no reference to reduced pay during this period. [Defendant's Ex. 12, p. 11].

In her new position, Ms. Harris prepared and responded to correspondence, answered telephones, and assisted tenants who were having issues with their homes. [Harris Dep., p 176]. She was not responsible for preparing RRHC's budget. [Plaintiff's Ex. F p. 2].

On approximately June 6, 2011, Mr. Sloan gave Ms. Harris a document that listed the rate of pay and salary of each RRHC employee, and instructed her to input its contents into a scheduling report. [Harris Dep., p. 147]. According to Ms. Harris, Sloan told her: "This is the names, [sic] the pay rate and the salary. This is what I want you to put in the report." [Harris Dep., p 58]. Ms. Harris agreed to do so. [Harris Dep. p. 34]. The previous week, she had been told by Mr. Burgess that the scheduling report would be "sen[t] out to HUD" and had shown her how to download blank forms from the HUD website. [Harris Dep. p. 33].

As she had been instructed, Ms. Harris downloaded a blank scheduling report from the HUD website and began copying the information from the document she'd been

3

#

given by Mr. Sloan into the downloaded form. The document listed Ms. Harris' hourly rate of pay as $15.00. [Plaintiff's Ex. I]. Upon completion, Ms. Harris was to give the completed scheduling report to Mr. Burgess. [Harris Dep. pp. 37-39].

Ms. Harris received her first paycheck for her position as a CFP Assistant on June 16, 2011. Ms. Harris had believed that she would be paid $15.00 per hour, but her first check indicated that she was only being compensated $13.50 per hour. [Harris Dep., pp. 125-26] [Plaintiff's Ex. 15].

Ms. Harris was upset because she was receiving less than she felt she was promised and was concerned that she was being asked falsify reports which were to be filed with a federal agency. That day, she spoke to Mr. Burgess and told him, "I can't report a falsified HUD report," to which he responded, "I understand, let me check some things out." [Harris Dep. p. 53].

She also wrote a letter to Mr. Sloan with the subject line: "Employee Grievance/Complaint." The letter expressed her concern and disappointment regarding her rate of pay. The letter reads: "Now if you told me that the pay rate for this position is $15.00 an hour and that is what you are reporting to HUD, I would like to receive $15.00 as my pay rate. I do not understand why I have to wait 6 months for my increase, if there is a policy on this I need a copy." [Defendant's Ex. 16] She dropped the letter off in his mailbox or on his desk that morning, and he came to speak with her later that day about the letter and the probationary period. [Harris Dep., pp.54-55] Mr. Sloan promised to get Ms. Harris a copy of the policy stating that new hires are placed on probationary

4

#

status and have their hourly wage reduced.  Ms. Harris did not bring up the allegedly falsified report during that meeting.

When she had not received a copy of the policy by June 20, Ms. Harris drafted another letter to Mr. Sloan on June 20, 2011 with "Grievance/Complaint" again as the subject line. In this letter, Ms. Harris wrote: "I'm am [sic] writing because this is my second request of a copy of the RRHC policy stating that each employee has to wait 6 months to get the pay that we were told we would receive upon hire [sic] for each position. I need to meet with you Mr. Sloan or the Commission or I need to contact HUD to get the situation rectified as soon as possible." [Defendant's Ex. 17].

Later that day, Ms. Harris did in fact contact HUD by emailing Ronald Wooster, a Revitalization Specialist in HUD's Office of Public Housing in Grand Rapids. [Defendant's Ex. 18]. In this email, Ms. Harris informed Mr. Wooster that she was being paid less than she had been promised, asked him if he was aware of the probation policy, and asked who she should speak with "to get this matter straightened out." [Plaintiff's Ex. 19]. The email makes no mention of the allegedly falsified reports.

On June 21, 2011 at around 11:00 a.m., Ms. Harris had a meeting with Mr. Sloan, Mr. Rogers, and Mr. Black, during which she was invited to express her concerns. [Plaintiff's Ex. DD]; [Rogers Dep. p. 66]. Ms. Harris insisted that she be given a copy of the probationary pay policy in writing. [Harris Dep. p. 188]. Mr. Rogers recalled that during the meeting, "she explained how she was given payroll information to generate a report to HUD and that she did not feel right filing a report stating that she would be paid $15.00 per hour when she was not getting $15.00 per hour." [Plaintiff's Ex. HH]. Mr.

#

Sloan recalled that "we kept telling her that's not her job duty to do the report so why are you harping on reporting this to HUD and that's not your job?" [Sloan Dep. pp. 123-24]. At the end of the meeting she was given a copy of the RRHC Handbook, which makes no mention of reduced pay during a probationary or orientation period. Ms. Harris acknowledges that during this meeting she did not specifically state that she was being asked to falsify a report. [Harris Dep. p. 63].

There is some confusion regarding what happened next, [1] but according to Ms. Harris, shortly after this meeting, Ms. Harris and Mr. Sloan had a private meeting in his office. She told him that the policy she had been given had "nothing to do with the percentage of pay being withheld. It has to do with work performance." He responded, "Ms. Harris, we have been doing this for years, over 16-some years." [Harris Dep. p. 189]. She responded, "I don't care what you've been doing for years. I need it in black and white." He asked, "Well, what if I can't produce the document to you?" She told him that if that were the case, "I would have to go over [his] head and contact HUD or whoever else I need to contact to make sure that this is valid." [Harris Dep. p. 189]. He told her, "Well, then I'm going to have to terminate you." Ms. Harris asked, "You're firing me? You're asking me to leave?" Mr. Sloan said, "Yes." [Harris Dep. p 189]. Ms. Harris then grabbed her purse and left. [Harris Dep. p. 190].

According to a statement of the events written by Mr. Rogers on the day this occurred, after Ms. Harris left Mr. Sloan's office, Mr. Sloan told Mr. Rogers and Mr.

###############################################################

[1] According to Mr. Sloan, Ms. Harris actually quit during the 11:00 meeting after he refused to change her rate of pay. [Sloan Dep. p. 114-15].

#

Black that he believed that Ms. Harris had quit because she had walked out. In any event, Mr. Sloan and Mr. Black agreed that Ms. Harris should be reprimanded for insubordination, disrespectful conduct during the meeting and for having just left work. [Defendant's Ex. 22 p. 2]. Mr. Sloan told Mr. Black and Mr. Rogers that he was already going to "sanction [Ms. Harris] for going outside the approved chain of command by contacting HUD." [Defendant's Ex. 22 p. 2] [Black Dep. pp. 43-44]

Shortly after leaving, Ms. Harris was eating lunch at her sister's house, when Nancy Pittman, an employee of RRHC, called her and informed her that RRHC employees were being told that she had quit.  Ms. Harris decided to return to RRHC to request a written letter of termination and to inform her former co-workers that she had not quit, but rather, had been terminated. [Harris Dep. p. 191]

At around 2:30 that day, Ms. Harris returned to RRHC. Again, a meeting was arranged between Ms. Harris, Mr. Sloan, and Commissioners Black and Rogers. [Harris Dep., p 194, 196]. At the meeting, Ms. Harris informed them that she had "recorded everything." When Commissioner Black attempted to interject, Ms. Harris told him that she wasn't speaking to him. [Harris Dep. p. 196] [Sloan Dep. p. 119].

According to Ms. Harris, Mr. Sloan said "Get out.  I'll get your termination letter and I'll mail it." Ms. Harris said "gentlemen have a good day," then left. [Harris Dep. p. 195] [Plaintiff's Ex. DD]. According to Mr. Sloan, though she had quit earlier that day, it was during this meeting that he terminated her for being "outspoken, rude, [and] loud to one of the commissioners and [him]self." [Sloan Dep. p. 107].

Plaintiff thereafter initiated the instant lawsuit.

7

## III.   DISCUSSION

### A.   APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir.2007). Yet, the non-moving party "may not rely merely on allegations or denials in its own pleading," but "must -- by affidavits or as otherwise provided in [Rule 56]-- set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1).  Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party." *Smith Wholesale*, 477 F.3d at 861 (internal quotation marks and citation omitted).

8

#

**B.**     **PLAINTIFF'S FAIR LABOR STANDARDS ACT CLAIM**

In Count I of her Amended Complaint, Plaintiff alleges a claim of retaliation in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the "FLSA").  Section 15(a)(3) of the Act makes it unlawful for any person to discharge an employee for filing a complaint of instituting a proceeding or testifying in a proceeding under or related to the Fair Labor Standards Act. 29 U.S.C. § 215(a)(3). "To establish a *prima facie* case of retaliation, an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (*citing Williams v. Gen. Motors Corp.*, 187 F.3d 553, 568 (6th Cir. 1999))." If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action." *Id.*

"To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011).

An employee's assertion of statutory rights under the FLSA, not the filing of a formal complaint, satisfies the first element. *See E.E.O.C. v. Romeo Community Schools*, 976 F.2d 985, 989 (6th Cir. 1992) (employee's complaint to employer of unlawful sex

#

discrimination and allegation that they were "breaking some sort of law" satisfied first element).

The Supreme Court recently passed upon the formality required to satisfy the first *prima facie* element of an FLSA retaliation claim in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325 (2011). In that case the employee "repeatedly called the unlawful [practice] to [his employer's] attention in accordance with [the employer's] internal grievance-resolution procedure." *Id.* at 1329. Plaintiff instructed his shift supervisor that he believed the employer was engaged in conduct that violated the FLSA. *Id.* at 1330. He told a human resources employee that he "was thinking about starting a lawsuit" regarding the employer's practice. *Id.* at 1330. He also told a human resources manager and an operations manager that "he thought the [practice] was illegal and that the company would lose in court." *Id.* at 1330. The employee was disciplined and ultimately discharged. The district court entered summary judgment against the employee on his retaliation claim because it construed the section as only applying to written complaints, *Kasten v. Saint-Gobain Performance Plastics Corp.*, 619 F.Supp. 2d 608, 611-613 (W.D. Wis. 2008). The district court's decision was affirmed on appeal. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 570 F.3d 834, 838-840 (7th Cir. 2009). The Supreme Court reversed, holding that the word "complaint," in the FLSA refers to oral as well as written complaints. *Kasten*, 131 S.Ct. at 1334-35.

The Court stated that "[t]o limit the scope of the antiretaliation provision to the filing of written . . . complaints made to employers . . . would discourage the use of desirable informal workplace grievance procedures to secure compliance with the Act."

10

#

*Id.* at 1334.  The Court also concluded that the "enforcement needs of [the FLSA] argue for an interpretation of the word 'complaint' that would provide 'broad rather than narrow protection to the employee.'" *Id.* (*quoting NLRB v. Scrivener*, 405 U.S. 117, 122 (1972)).

"[A] complaint is "filed" when "a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act." *Id.* at 1335. The Court recognized that employers must be given fair notice of an employee's FLSA complaint to satisfy the "complaint" requirement. "[T]he phrase "filed any complaint" contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." *Id.* at 1334. (quotations and alterations omitted). The Court noted that the employee will generally be able to show his or her employer had fair notice by showing that the employer fired her *because* she filed a complaint. *Id.* at 1334-35.

Plaintiff's statements in her letters and during meetings with her superiors at RRHC would have been sufficiently clear to put Defendant on notice that she was alleging a violation of the FLSA *if* paying an employee less than what she was promised, refusing to produce any written evidence documenting the policy that enables an employer to pay its employee less than she was promised during a probationary period, or asking an employee to help create an inaccurate form for submission to another agency were violations of the FLSA.

11

#

Section 211(c), the subsection of the FLSA to which Plaintiff's complaints related, states:

> Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

29 U.S.C. § 211(c). The regulation proscribed by the Administrator of the Wage and Hour Division requires employers to "preserve payroll or other records containing," *inter alia*, unexempted employees' name, home address, sex, "[t]ime of day and day of week on which the employee' workweek begins," "[r]egular hourly rate of pay for any workweek in which overtime compensation is due," "[h]ours worked each workday and total hours worked each workweek," "[t]otal wages paid each pay period," and the "[d]ate of payment and the pay period covered by the payment." 29 C.F.R. § 516.2.

According to Plaintiff, she was engaged in an FLSA protected activity because "the FLSA requires employees to 'make, keep, and preserve' truthful and accurate pay records [and makes it] unlawful for an employer to violate the recordkeeping provision." [Plaintiff's Motion, p. 22]. 29 U.S.C. §§ 211(c), 215(a)(5)). She maintains because her complaint relates to defendant's obligation to keep accurate pay records under [29 U.S.C. § 211(c)], it is entitled to the same protection as any other complaint filed under, or related to, the FLSA, such as one regarding overtime or child labor." *Id.*, p. 23.

12

#

Plaintiff did not, and does not, claim that the HUD form she was being asked to fill out and the document she was given by Mr. Sloan were the only documents that RRHC had that could satisfy Section 211(c)'s requirement that employers keep records of their employee's wages. Plaintiff knew that this was not the case because the Earnings Statement she had been given with her first paycheck as a CFP Assistant contained accurate information about her hourly pay rate, which is what alerted her to the fact that she was not being paid $15.00 per hour. [Plaintiff's Ex. 7].

Nor did Plaintiff express any concern that the document she was being asked to create was to be used as, or in place of, the report that Section 211(c) requires employees to prepare in compliance with the standards set forth by the Administrator of the Wage and Hour Division of the United States Department of Labor.  Plaintiff did not express concern that RRHC was not keeping accurate records of its employees' rate of pay. According to Plaintiff, she knew the report was being prepared for HUD because she had been told that it was being prepared to be sent off to HUD. [Harris Dep. p. 33].

 Plaintiff believes that the"[t]he Schedule was part of defendant's Operating Budget for the fiscal year ending June 30, 2012." [Plaintiff's Motion, p. 23]. Section 211(c) requires employers to make and preserve accurate records once wages are earned. It does not prohibit employers from making rough estimates or erroneous, or even deliberately false, projections of their operating budgets or their employees' future wages. Simply stated, nothing in the FLSA prohibits an employer from submitting non-conforming forms to the U.S.  Department of Housing and Urban Development.

#

Because Plaintiff's complaints did not allege a violation of the FLSA, and her complaints were not sufficiently clear so as to put Defendant on notice that she was alleging a violation of the FLSA, she has failed to make a *prima facie* case of a violation of the FLSA's antiretaliation provision.

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment on Count I of Plaintiff's Amended Complaint.

## C.   <u>PLAINTIFF'S WHISTLEBLOWER'S PROTECTION ACT CLAIM</u>

Defendant also seeks summary judgment on Plaintiff's claim in Count II of her Amended Complaint that Defendant violated the Michigan Whistleblowers Protection Act ("WPA") by terminating her. The WPA provides in pertinent part:

> An employer shall not discharge ... an employee ... because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body.

Mich. Comp. Laws § 15.362.

To prevail on a claim under the WPA, a plaintiff must demonstrate that: (1) she was engaged in protected activity as defined by the Act; (2) the defendant discharged her, and (3) a causal connection exists between the protected activity and the discharge. *Shallal v. Catholic Soc. Servs. of Wayne County,* 455 Mich. 604, 610, 566 N.W.2d 571 (1997). Actions under the WPA are analyzed using the burden-shifting framework utilized in retaliatory discharge actions under Title VII. *Taylor v. Modern Engineering, Inc.,* 252 Mich.App. 655, 662, 653 N.W.2d 625, 630 (2002).

14

#

In this case, the parties do not dispute that Plaintiff was discharged from her employment with RRHC. Thus, the primary issues before the Court are (1) whether Ms. Harris was engaged in protected activity under the WPA and, (2) assuming she was engaged in such activity, whether there is a causal connection between her activity and the discharge.

The Michigan Supreme Court defines an employee who is "about to report" a violation or a suspected violation as one who "is on the verge of" doing so. *Shallal*, 566 N.W.2d at 575.  "[T]he language of the Whistleblowers' Protection Act intentionally reduces employee protection the more removed the employee is from reporting to a public body." *Id.* at 576.  An employee who is "about to report" a violation of the law receives the same level of protection as an employee who actually reports it to a public body. Mich. Comp. Laws § 15.362.

In order to establish a claim under this prong, plaintiff must ultimately show: (1) by clear and convincing evidence that she or a person acting on her behalf was about to report, verbally or in writing, a violation or a suspected violation of a law of this state to a public body, *see* Mich. Comp. Laws § 15.363(4); and (2) that the person who fired her was objectively aware that she was about to make a report before she was fired. *Kaufman & Payton, P.C. v. Nikkila* 200 Mich.App. 250, 257-58, 503 N.W.2d 728, 732 (1993). The Michigan Supreme Court has recognized that the "clear and convincing evidence standard" is "the most demanding standard applied in civil cases," and a standard that has been incorporated into Michigan statutory enactments. *See In re Martin,* 450 Mich. 204, 226-27, 227 n. 22, 538 N.W.2d 399 (1995).

#

Evidence is clear and convincing when it "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Evidence may be uncontroverted, and yet not be "clear and convincing." ... Conversely, evidence may be "clear and convincing" despite the fact that it has been contradicted. *In re Martin,* 538 N.W.2d at 410 (quoting *In re Jobes,* 108 N.J. 394, 529 A.2d 434 (1987)).

In *Shallal*, the Michigan Supreme Court found "clear and convincing evidence" that the plaintiff was about to report her supervisor's abuse of alcohol and agency funds where the plaintiff supported her claim with deposition testimony that she personally confronted her supervisor with his violations. *Shallal*, 566 N.W.2d at 579. The plaintiff also corroborated this testimony with entries from her personal calendar that identified by date the people with whom she spoke about her desire to report her supervisor. *Id.* A plurality of the court rejected the notion that a plaintiff should be required to say "magic words" in order to reap the protections of the statute. It held that plaintiff's statement, "if you don't straighten up . . . I will report [you]," especially coupled with the plaintiff's other actions, established that the plaintiff was engaged in protected activity. *Id.*

Similarly, in an unpublished decision the Michigan Court of Appeals found that the plaintiff, a dental hygienist, was "about to report" her employer's illegal billing practices to the Michigan Department of Consumer and Industry Services where the plaintiff submitted evidence that she had copied records, attempted to contact the insurance hotline, and obtained a complaint form, before confronting her employer.

16

#

*Fogwell v. Klein,* No. 223761, 2001 WL 1134883 (Mich.Ct.App. Sept. 25, 2001), *lv. denied,* 468 Mich. 864, 659 N.W.2d 227 (2003). The combination of actions and communication with her supervisor were deemed sufficient to show that the plaintiff was "on the verge" of reporting a violation of law. *See id.*

Defendant argues that Plaintiff cannot establish that she was engaged in protected activity under the WPA because "her pre-termination communications with HUD and to RRHC do not state that she was being asked to falsify an optional report." If Plaintiff's sole concern had been contractual -- that she was not being paid what she had been promised -- she would have likely contacted a lawyer or an employee of the Department of Labor to report the discrepancy.  However, Plaintiff took the initial step of contacting HUD because it was to HUD she believed that RRHC was going to submit false reports.

According to Plaintiff, during her pre-termination meeting on July 21, she told Mr. Sloan and Black, "You want me to do this report to HUD stating that I make $15 dollars [sic] an hour." "Why can't I report my true salary?" "I'm not reporting 15 dollars to HUD."

According to Plaintiff, she was fired by Mr. Sloan immediately after she told him that if he did not produce a written copy of the probationary policy, she "would have to go over [his] head and contact HUD or whoever else [she] need[ed] to contact to make sure that this is valid." Further, Plaintiff did not demand a pay increase; she demanded a written copy of the probationary policy, which she claims, and which can logically be interpreted as demonstrating that she was attempting to gather evidence to bolster her

#

report to HUD, if RRHC would not relent in its demand that she prepare an inaccurate report for submission to HUD

Plaintiff has provided sufficient evidence that she was about to report what she suspected was illegal activity to HUD to enable a reasonable jury "to come to a clear conviction, without hesitancy" that she was "on the verge" of making such a report.

A plaintiff making a WPA claim is also required to prove a causal connection between her protected action and the subsequent discharge. *West v. General Motors Corp.,* 469 Mich. 177, 665 N.W.2d 468 (2003). "Summary [judgment] for the defendant is appropriate when a plaintiff cannot factually demonstrate a causal link between the protected activity and the adverse employment action." *West v. Gen. Motors Corp.*, 469 Mich. 177, 184, 665 N.W.2d 468, 472 (2003).  "[A] temporal relationship, standing alone, does not demonstrate a causal connection between the protected activity and any adverse employment action." *Id.* at 472-73. "Plaintiff must show something more than merely a coincidence in time between protected activity and adverse employment action." *Id.*

According to Defendant, "Plaintiff . . . cannot establish causation because she failed to provide objective notice to RRHC of a report or a threat to report a violation of the law." Plaintiff submits that she has provided sufficient evidence to establish causation because: (1) "the timing between the protected activity and termination here is almost instantaneous;" (2) Mr. Sloan told Plaintiff that he was firing her because she was going to contact HUD; and (3) According to Mr. Rogers, Mr. Sloan told Mr. Rogers that he was going to sanction Plaintiff for having contacted HUD.

#

Plaintiff made no reference to any particular statutory provision in her communications with her superiors.   However, a reasonable jury could find that Defendant had in fact received objective notice from Plaintiff that she suspected that submitting a false reports to HUD violated the law, and that she intended to report this violation unless Defendant allowed her to reduce the rate of pay listed on the HUD form to accurately reflect her actual rate of pay or increased her actual rate of pay so that the HUD form would be accurate.

Prior to her termination, Mr. Sloan acknowledged that he knew Plaintiff intended to contact HUD, and knew her reason for doing so. "In that meeting all I remember is we kept telling her that's not her job to do that report so why are you harping on reporting this to HUD?" [Sloan Dep. 123-24]. He also told Mr. Black that he intended to sanction her for having contacted HUD.  Mr. Sloan, and Plaintiff's other superiors who were at the meeting on June 21 prior to her termination, had been told directly that Plaintiff's concerns were not simply that she was being paid less than she felt she was promised, but also that she was being asked to fill out an inaccurate report that she believed were going to be submitted to HUD.  Plaintiff remembers Mr. Sloan firing her immediately after she told him that if he did not produce a written copy of the probationary policy, she "would have to go over [his] head and contact HUD or whoever else [she] need[ed] to contact to make sure that this is valid."

While a temporal relationship alone is not sufficient to establish a causal connection, the fact that Plaintiff and Defendant spent the entire afternoon discussing whether or not she would report the false report to HUD and she was terminated as a

19

result of her statement that she "would have to contact HUD," shows more than a mere coincidence regarding the timing of her termination and her engagement in protected activity.

If credited by the jury, this could be sufficient to establish objective awareness on the part of Defendant.

Defendant also argues that "Plaintiff cannot establish a causal connection because Michigan law requires that a whistleblower's primary motivation be a desire to inform the public, not to act in self interest." In support, Defendant cites *Whitman v. City of Burton*, in which the Michigan Court of Appeals stated: "[W]hen considering a retaliation claim under the act, a critical inquiry is whether the employee acted in good faith and with a desire to inform the public on matters of public concern." *Whitman v. City of Burton*, 293 Mich.App. 220, 230, 810 N.W.2d 71 (2011). The Michigan Supreme Court has granted leave to appeal the Michigan Court of Appeal's decision in *Whitman*, and has specifically invited the parties to brief whether *Shallal* "correctly held that the primary motivation of an employee pursuing a whistleblower claim must be a desire to inform the public on matters of public concern, as opposed to personal vindictiveness." *Whitman v. City of Burton*, 491 Mich. 913, 811 N.W.2d 490 (2012).

In *Shallal*, the vindictiveness and bad faith of the employee precluding relief under the WPA was an attempt to extort her employer. *Shallal*, 566 N.W.2d at 579. In *Whitman*, the Michigan Court of Appeals held that the bad faith precluding relief involved the employee "withholding his accusation until after he accumulated thousands of dollars worth of sick and vacation time . . . [then] stockpiling his hours and, when most

20

#

personally advantageous, threaten[ing] legal action if defendants did not pay [him] for them." *Whitman*, 810 N.W.2d at 76.

While it is unclear whether the Michigan Supreme Court's statement in *Shallal* that "[t]he primary motivation of an employee pursuing a whistleblower claim must be a desire to inform the public on matters of public concern, and not personal vindictiveness," *Shallal*, 566 N.W.2d at 579 (citations omitted)[2], remains good law, there is a genuine issue of fact regarding what Ms. Harris's primary motivations were and whether she was engaged in the kind of vindictiveness that precludes protection under the WPA.

Plaintiff contends that her "central concern was public fraud," and seeks to support this assertion with her June 16 letter to Mr. Sloan in which she wrote, "Now if you told me that the pay rate for this position is $15.00 an hour and that is what you are reporting to HUD, I would like to receive $15.00 as my pay rate." In her deposition, Plaintiff stated that she used this language "[t]o emphasize that it would be fraudulent" for defendant to falsely report to HUD. [Harris Dep. pp. 140-41. Because [t]he evidence must be viewed in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences," and a rational jury could believe Plaintiff's testimony

###############################################

[2] *See, e.g., Whitman*, 491 Mich. 913, 811 N.W.2d 490; *Morris v. Aon Serv. Corp.*, 10-14620, 2011 WL 5864757 (E.D. Mich. Nov. 22, 2011) *reconsideration denied*, 10-14620, 2011 WL 6217439, *6 (E.D. Mich. Dec. 14, 2011) ("Although the case law is not uniformly clear, it appears that "the WPA does not require that the plaintiff possess any particular intent when making her report." There is no rule from *Burton*…that a WPA claim fails if the plaintiff intends to "advance his own financial interests" rather than "inform the public on a matter of public concern.") (quoting *Johnson v. County of Jackson*, 2003 WL 22113958, at *3 (Mich.Ct.App. Sept. 11, 2003))).

#

regarding her subjective motivations and could also reasonably construe ambiguities in statements made by Plaintiff in letters and meetings, summary judgment is inappropriate on this issue. *Smith Wholesale Co.*, 477 F.3d at 861.

Whatever Plaintiff's motivations were, Defendant has made no showing that Plaintiff was acting vindictively or in bad faith.  The plaintiffs in *Shallal* and *Whitman* withheld their accusations until an opportune time so that they could personally profit. Here, upon discovering the discrepancy between her actual rate of pay and the rate of pay she was asked to input on the HUD form, Plaintiff immediately and continuously sought to resolve the matter.   Additionally, Plaintiff's attempts to identify other RRHC employees who were also being paid less than they had been told, indicated her desire to create accurate reports that would be filed with HUD or to expose a larger fraud if the false reports were filed. [Harris Dep. p 142] Plaintiff's relentless pursuit of a written statement of the probationary policy may also be interpreted by a jury as supporting Plaintiff's explanation that she did not report the alleged fraud sooner because she was attempting to build a larger case against RRHC.

For all of these reasons, summary judgment will be denied on Plaintiff's Whistleblower's Protection Act claim.

**D.      PLAINTIFF'S FALSE CLAIMS ACT CLAIM**

Plaintiff also alleges a federal whistleblower's claim under the False Claims Act (FCA).   A person who presents false claims for payment to the federal government violates the False Claims Act ("FCA"). 31 U.S.C. § 3729. The FCA also "protects employees who pursue, investigate, or otherwise contribute to an action exposing fraud

22

#

against the government." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir.

2003). The FCA's antiretaliation provision provides in pertinent part:

> Any employee, contractor, or agent shall be entitled to all relief necessary
> to make that employee, contractor, or agent whole, if that employee,
> contractor, or agent is discharged, demoted, suspended, threatened,
> harassed, or in any other manner discriminated against in the terms and
> conditions of employment because of lawful acts done by the employee,
> contractor, agent or associated others in furtherance of an action under this
> section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h):

To establish a claim for retaliatory discharge under this section, "a plaintiff must

show (1) he engaged in a protected activity; (2) his employer knew that he engaged in the

protected activity; and (3) his employer discharged or otherwise discriminated against the

employee as a result of the protected activity." *Yuhasz*, 341 F.3d at 566 (citing *McKenzie*

*v. BellSouth Telecomm., Inc.,* 219 F.3d 508, 513-514 (6th Cir. 2000)). Protected activity"

is defined as "activity which reasonably could lead to a viable FCA action," although an

employee need not undertake the activity with actual knowledge of the FCA. *McKenzie*,

219 F.3d at 516. "A plaintiff must only allege activities "that would have given [the

defendant] reason to believe that she was contemplating a *qui tam* action." *U.S. ex rel.*

*Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2008).

Protected activity should be interpreted broadly. *McKenzie*, 219 F.3d at 515. The

directive to "broadly construe" the plaintiff's "protected activity," however, does not

eliminate the necessity that the actions be reasonably connected to the FCA, which was

designed to encourage and protect federal whistleblowers." *Id.*

23

#

In *Marlar*, the Sixth Circuit held that an employee who "pleaded she repeatedly objected to her superiors about" inaccurate records, which were being used to defraud the federal government was engaged in FCA protected activity. *Marlar*, 525 F.3d at 350. There, the employee told her employer that she believed it was "receiving large incentive payment payments under its contract with" the Department of Energy by "underreporting its employees work-related injuries and illnesses." *Id.* at 350. Plaintiff had stated a claim under the FCA by alleging that "she observed purportedly fraudulent activity and confronted her employer about it," connected her complaint (underreporting) to concern about fraud on the government, and "because she informed [her employer] of her concerns, she was terminated." *Id.*

Here, Plaintiff was told that reports that she was asked to fill out would be submitted to HUD. She recognized when she received her first paycheck that the form she was being asked to create was inaccurate. She complained several times to her superiors that she was being asked to participate in the creation of an inaccurate document, which were to be submitted to HUD. Defendant now argues that the inaccurate Schedule was never sent to HUD. However, it is unclear if Plaintiff's actions, including fear that Plaintiff would bring this action, are the reason this is true.

As discussed above, Plaintiff makes a plausible claim that she was terminated because of her complaints regarding Defendant's preparation of false documents, which it intended to submit to HUD. Plaintiff's activity in this case, if believed, reasonably could have lead to a viable FCA action. She alleges that she brought this to Defendant's attention and was fired because of it. Plaintiff may proceed with her claim under 31

24

#

U.S.C. § 3730(h).  Therefore, Defendant's motion for summary judgment will be denied on this claim, as well.

E.      **PLAINTIFF'S MICHIGAN PUBLIC POLICY CLAIM**

Lastly, Plaintiff alleges a common law claim for violation of public policy. "Michigan courts have recognized a "public policy" exception to the general rule that an at-will employee may be terminated at any time for any reason." *Humenny v. Genex Corp.*, 390 F.3d 901, 907 (6th Cir. 2004) (citing *Suchodolski v. Mich. Consol. Gas Co.,* 412 Mich. 692, 316 N.W.2d 710, 711 (1982). However, "[a]s a general rule, the remedies provided by statute for violation of a right having no common-law counterpart are exclusive, not cumulative." *Dudewicz v. Norris-Schmid, Inc.*, 443 Mich. 68, 80, 503 N.W.2d 645, 649 (1993) *disapproved on other grounds by Brown v. Mayor of Detroit*, 478 Mich. 589, 734 N.W.2d 514 (2007). "A public policy claim is sustainable...only where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue." *Dudewicz*, 443 Mich. at 80; 503 N.W.2d at 650. "Plaintiff recognizes that when a statute provides relief for retaliatory discharge, a public policy claim fails."

Because the same facts giving rise to Plaintiff's public policy count also give rise to potential violations of the Whistleblowers Protection Act and the False Claims Act, Plaintiff's Michigan Public Policy Claim is preempted.

#

## IV.   <u>CONCLUSION</u>

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant River Rouge Housing Commission's May 31, 2012 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Specifically, Defendants' Motion is GRANTED on Plaintiff's claims in Counts I and III for violation of the Fair Labor Standards Act and Michigan Public Policy. However, Defendant's Motion is DENIED with respect to Plaintiff's claims under the Michigan Whistleblower Protection Act and the False Claims Act (Counts II and IV of Plaintiff's Amended Complaint). The case will proceed to trial only on those claims.

SO ORDERED.


Dated:  March 29, 2013                    s/Gerald E. Rosen
                                          GERALD E. ROSEN
                                          CHIEF, U.S. DISTRICT COURT


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 29, 2013, by electronic and/or ordinary mail.

                                          s/Julie Owens
                                          Case Manager, (313) 234-5135

#